AT & T INFORMATION SYSTEMS, INC., Plaintiff,

v.

GENERAL SERVICES ADMINISTRATION, Defendant.

Civ. A. No. 85–1197.

United States District Court, District of Columbia.

Feb. 6, 1986.

D. Michael Fitzhugh, Thomas A. Lemmer, McKenna, Conner & Cuneo, Washington, D.C., for plaintiff.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This matter first came before the Court when plaintiff AT & T Information Systems ("AT & T–IS") filed its complaint for a declaratory judgment and preliminary and permanent injunctions. Plaintiff sought to prevent defendant General Services Administration ("GSA") from releasing certain information that GSA had determined to release in response to Freedom of Information Act ("FOIA") requests. The FOIA requests were made by a number of other entities not parties to this litigation[1] and sought information relating to AT & T–IS's successful bid for a GSA procurement contract. AT & T–IS claims that GSA's decision to release the information over AT & T–IS' protests was an abuse of discretion and not in accordance with law. AT & T–IS further claims that GSA should

be permanently enjoined from releasing the contested information. Subsequent to the filing of the complaint, AT & T–IS and GSA filed cross motions for summary judgment and entered into a stipulation by which GSA agreed not to release the contested documents "until the Court decides the matter on motions for summary judgment."[2] Those cross motions are presently before the Court; all issues have been thoroughly briefed and argued. Both parties agree that the facts are not in dispute so that no special master or expert witness is needed and the motions are ripe for decision. *See* Defendant's Supplemental Memorandum (filed September 9, 1985); Plaintiff's Memorandum on the Question of Whether this Court May Resolve this Action on Motions for Summary Judgment (filed September 9, 1985).

### I.

GSA recently commenced a nationwide purchase of a new federal telecommunications system. In all, twelve multi-city telecommunications systems will be procured in the "Aggregated Switch Procurement" ("ASP") program, developed by GSA to competitively procure telecommunications systems for civilian federal government offices in different regions.

AT & T–IS bid for and, on March 1, 1985, was awarded the New England area contract, the first in GSA's ASP series.[3] GSA had received four proposals in response to its April 27, 1983 Request for Proposals ("RFP"); as of January 30, 1985, AT & T–IS and GTE Communications Systems,

---

1. At the time of filing of defendant's motion for summary judgment, GSA had received FOIA requests relating to the information at issue in this case from eight different companies, competitors of AT & T–IS.

2. The stipulation also recited the parties' agreement that the Court's decision in this case will be determinative of GSA's right to release the documents in issue to all of the entities requesting their release.

3. Proposals for the second ASP procurement, a procurement for the Midwest, were originally due July 11, 1985. The remaining ASP procurements should be negotiated and awarded by approximately the fall of 1987. The contract value for all ASP procurements is estimated to exceed $1 billion. Declaration of Martin B. Wangberg ("Wangberg Decl.") at ¶ 2 (filed April 16, 1985) (attached as Exhibit 1 to Plaintiff's Motion for a Preliminary Injunction (filed April 16, 1985).

Inc. ("GTE") alone remained in the competitive range. Following the award of the contract to AT & T–IS on March 1, 1985, GTE on March 4, 1985 submitted a FOIA request to GSA, seeking the complete technical and price proposals submitted by AT & T–IS as well as certain internal documents generated by the agency during the procurement bid process.

On March 6, 1985, GSA notified AT & T–IS of GTE's FOIA request. GSA sent AT & T–IS a copy of the request, and asked AT & T–IS to identify documents that it considered to be confidential and to provide explanation for the claim of confidentiality.

AT & T–IS responded on March 20 and March 28, 1985 to the GSA request and indicated, *inter alia*, that disclosure of AT & T–IS' prices would reveal the company's prices and discount strategy for this and future ASP contracts and that, consequently, release would cause AT & T–IS substantial competitive harm. From March 6 through early April, 1985, AT & T–IS personnel and counsel met with GSA personnel in an attempt to resolve the dispute over the information that GSA had been requested to release.

On April 9, 1985, GSA informed AT & T–IS by letter of the final disclosure determination made by Harry H. Fuchigami, Director of the Office of Information Resources Procurement, Office of Information Resources Management, General Services Administration. The April 9, 1985 letter from Mr. Fuchigami[4] advised Mr. Harry Carr of AT & T–IS "that [GSA would] release a complete copy of [AT & T–IS'] proposal except those portions identified in the enclosed response to the requestor." The letter further stated that "[i]n reaching [its] decision to release this information, [GSA had] carefully considered the comments in [AT & T–IS'] letters."

GSA's (per Fuchigami) rationale for withholding certain documents from the requestors was reflected in the April 9, 1985 letter to GTE, a copy of which was attached to the letter of the same date to AT & T–IS. In part, Mr. Fuchigami stated:

> The information withheld under exemption (4) relates to the configuration of the switching system and the Switch Management Center (SMC), cost and financial data, company personnel, their qualifications, unique skills, educational background, and company past experience. *Release of this data would reveal the contractor's internal operations and business practices, thereby diminishing its competitve abilities.* In addition, release could render future negotiations difficult if offerors became reluctant to furnish such information for fear of disclosure by the Government.

Letter from Harry H. Fuchigami to Stanford Miller, GTE Business Communications Systems, Inc. at 1 (April 9, 1985) (attached as Exhibit 3 to Defendant's Memorandum) (emphasis added).

In all, GSA (per Fuchigami) determined to release 2707 pages of material responsive to the FOIA requests. Of the 2707 pages, AT & T–IS identifies approximately 32 pages, collected in six documents, that AT & T–IS maintains *do* contain confidential commercial or financial information. These six documents are the only documents at issue in this case and have been filed under seal with the Court. The six documents are as follows (detailed descriptions of these documents and their contents are found at pp. 9–13 of the Fuchigami Declaration).

(a) Schedule A—station equipment;

(b) Aggregate totals for the Switch Management Center ("SMC") and for each system at each location;

(c) Life cycle raw cost summaries;

---

**4.** A copy of this letter is attached as Exhibit 3 to the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Preliminary Injunction (filed June 25, 1985) ("Defendant's Memorandum"). Also attached is the Declaration of Harry H. Fuchigami ("Fuchigami Declaration") (June 19, 1985).

(d) "BARS" (Bid Analysis and Reporting System) system input and output;

(e) AT & T–IS' January 30, 1985 letter containing its lease financing proposal; and

(f) Schedule D—service charges.

Three of these documents, [ (a) Schedule A, station equipment; (e) AT & T–IS' January 30, 1985 letter containing its lease financing proposal; and (f) Schedule D, service charges] were contained in AT & T–IS' proposal for the New England ASP contract. Two of the remaining three documents, [ (c) life cycle raw cost summaries; and (d) BARS system input and output], were generated by GSA during its evaluation of AT & T–IS' proposal. The remaining document, [ (b), containing aggregate totals for the SMC and for each system at each location], was generated by GSA after it had received the GTE FOIA request.[5]

Mr. Fuchigami's determination, reflected in his April 9 letters, that these six documents were subject to mandatory release under the FOIA was again expressed, with somewhat greater detail, in his June 19, 1985 Declaration. Providing specific explanations for his determination with respect to each of the individual documents, *id.* at 13–15, Mr. Fuchigami also stated:

I understand AT & T–IS to be arguing that disclosure of these unit prices would allow a competitor to calculate the discount from the commercial price which AT & T–IS offered the government for this contract and thus will enable a competitor to discern AT & T–IS pricing/discount strategy to its commercial detriment. However, it is also my understanding that a Government contract is a matter of public record and unit prices on a Government contract are generally re-

leaseable. I believe the AT & T–IS argument to be speculative and on balance believe that public disclosure of these documents is required under the FOIA. *Id.* at 4 ¶ 12. Mr. Fuchigami concluded: "I do not believe that release of these documents will directly or indirectly reveal trade secrets or confidential financial information as I understand the meaning of those phrases as used in the FOIA. Thus, I do not believe the release of these documents will cause AT & T–IS substantial competitive harm." *Id.* at 15.

This suit followed the GSA's April 9, 1985 announcement that it intended to release these documents.

## II.

AT & T–IS contends that GSA's determination to disclose the six documents in issue is an abuse of discretion and not in accordance with law because: (1) the Trade Secrets Act, 18 U.S.C. § 1905,[6] prohibits disclosure of the information contained in these documents; (2) 5 U.S.C. § 552(b)(4) ("Exemption 4") protects confidential commercial or financial information from mandatory disclosure under FOIA; and (3) the Federal Acquisition Regulation together with a balancing of interests requires the withholding of the commercial or financial information contained in the six documents in dispute. Plaintiff further contends that GSA's decision to release this information is not in accordance with law because, pursuant to 5 U.S.C. § 552(b)(3) ("Exemption 3") (in combination with the Trade Secrets Act), confidential commercial or financial information may not be released by GSA.

In general, defendant responds that the decision to release the information was rea-

---

**5.** Wangberg Decl. ¶ 5; Fuchigami Decl. ¶ 9. Defendant in its statement of material facts not in dispute, ¶ 13, described this last document as "solely generated by GSA for the purpose of analyzing the AT & T–IS proposal." This description seems controverted by the Fuchigami Decl. at ¶ 36b, which states that "[t]hese documents were created as a substitute for the portions of Schedule A (switching equipment and switch management center) which are being withheld as proprietary," and ¶ 31, which states that they were "generated in response to

the FOIA request as a substitute for the information being withheld on Schedule A."

**6.** The pertinent part of this statute prohibits, unless authorized by law, the disclosure of information relating to "trade secrets, processes, operations, style of work or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses or expenditures of any person, firm, partnership, corporation, or association ...." 18 U.S.C. § 1905.

sonable and should not be overturned by the Court. Defendant contends that the information contained in the documents at issue is not protected from mandatory disclosure under the FOIA by the Trade Secrets Act or by Exemption 4 of the FOIA. Defendant further argues that the Federal Acquisition Regulation does not control the decisions at issue in this case. Finally, defendant contends that FOIA Exemption 3 does not provide an independent ground protecting the contested documents from mandatory disclosure.

### III.

■ It is initially important to clarify the proper scope of judicial review of GSA's decision. As an entity which has submitted information to the government, AT & T–IS may, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (1982), challenge the agency's decision to release information under the FOIA. *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 19 L.Ed.2d 208 (1979). AT & T–IS is entitled to relief under the APA if GSA's decision to release the contested documents was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or ... failed to meet statutory, procedural, or constitutional requirements." *NOW, Washington, D.C. Chapter v. Social Security Administration,* 736 F.2d 727, 745 (D.C.Cir.1984) (per curiam) (McGowan and Mikva, JJ. separate opinion concurring in the result) (quotation marks and citations omitted). As our Court of Appeals has summarized:

[t]he "focal point for judicial review" in such cases "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)] (per curiam). *See also United States v. Carlo Bianchi & Co.* 373 U.S. 709, 715 [83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963)] ("in cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, ... consideration is to be confined to the adminis-

trative record and ... no *de novo* proceeding may be held").

*Id.* As this Court stated in *Canal Refining Co. v. Corrallo,* 616 F.Supp. 1035, 1037 (D.D.C.1985) (appeal pending):

an information-submitter *may* seek to enjoin the disclosure of information that it has given to the agency, but such actions are limited to suits under the APA, and, except where a plaintiff can show that the agency's factfinding procedures are "severely defective" [citation omitted] the judicial role is limited to a review of the pre-existing administrative record.

*See also Chrysler v. Brown, supra,* 441 U.S. at 318, 99 S.Ct. at 1726 (*"De novo* review by the District Court is ordinarily not necessary to decide whether a contemplated disclosure runs afoul of [the Trade Secrets Act, 18 U.S.C.] § 1905").

### IV.

The rationale of GSA's decision of April 9, 1985 is spelled out in the letters of that date to GTE and AT & T–IS, and in the June 19, 1985 declaration of its decisionmaker, Harry H. Fuchigami. The April 9 letters and the 15 page Fuchigami Declaration are the core of the GSA decision here reviewed.

The Fuchigami Declaration is amply corroborated by letters that are part of the stipulated administrative record. Those letters indicate that Mr. Fuchigami contemporaneously considered the factors on which he relies in his June 19, 1985 declaration, and that that declaration is not simply a *post hoc* rationalization that must be discounted by the Court. *Compare Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). In his April 9, 1985 letter to GTE, for example, Mr. Fuchigami indicated that certain documents would not be released to GTE because AT & T–IS had persuaded the agency that competitive harm would result to AT & T–IS from such disclosure. That letter, quoted *supra* at 1398, indicates that Mr. Fuchigami had evaluated AT & T–IS'

claims with respect to the information GSA intended to release and made the determination that those claims were appropriately made with regard to some documents but not others (including the six documents at issue in this litigation). These earlier statements, made contemporaneously with the determination to release the information, establish that the June 19 declaration was not a *"post-hoc* rationalization," and, accordingly, is an appropriate element of the administrative record here.

That administrative record, the parties' pleadings and oral arguments demonstrate that GSA's factfinding procedures were not "severely defective," and the agency's determination to release the contested information was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [and did not fail] to meet statutory, procedural, or constitutional requirements." *See NOW, supra,* 736 F.2d at 745. Accordingly, the accompanying order will grant defendant's motion for summary judgment.

### A.

Both plaintiff[7] and defendant[8] recognize that the Trade Secrets Act and Exemption 4 to the FOIA are co-extensive. Thus, if the information contained in the six documents at issue is protected from mandatory disclosure under FOIA by Exemption 4, GSA's release of those documents would not be in accordance with 18 U.S.C. § 1905. Conversely, if the information is not protected from mandatory disclosure under FOIA by Exemption 4, 18 U.S.C. § 1905 should not prohibit its release.

FOIA exemption 4 protects from mandatory disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).[9] The parties do not dispute that the information in the six documents in issue is commercial or financial information "obtained from a person," and AT & T–IS makes no claim of privilege. The only issue remaining under Exemption 4, therefore, is whether the information is confidential. *See* Plaintiff's Memorandum at 15; Defendant's Memorandum at 9.

> Our Court of Appeals has clarified that: commercial or financial matter is "confidential" for purposes of [Exemption 4] if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; [footnote omitted] or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

*National Parks and Conservation Association v. Morton,* 498 F.2d 765, 770 (D.C. Cir.1974).

The first prong of the test does not apply as GSA, by deciding to release the information, necessarily made the determination that disclosure will not impair its ability to obtain information in the future. "The agency is in the best position to determine the effect of disclosure on its ability to obtain necessary technical information." *Orion Research, Inc. v. Environmental*

**7.** *See* Plaintiff's Memorandum in Support of its Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Memorandum") at 14–15 (filed July 25, 1985).

**8.** *See* Defendant's Memorandum at 9.

**9.** Defendant convincingly argues, and plaintiff does not appear to contest, that our Court of Appeals has adopted a narrow definition of the term "trade secrets" in FOIA Exemption 4. *See Public Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1288 (D.C.Cir.1983) ("[W]e define trade secret, solely for the purpose of FOIA Exemption 4, as a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort"). The parties appear to agree that this narrow definition would exclude the pricing information that AT & T–IS seeks to prevent GSA from disclosing. *See* Defendant's Memorandum at 10–12; Plaintiff's Memorandum at 15. The fact that this information does not constitute a trade secret under this Circuit's interpretation of that term in FOIA Exemption 4, however, does not finally resolve the issue of Exemption 4 application. Such information may nevertheless be protected from disclosure if it is commercial or financial information that is confidential.

*Protection Agency,* 615 F.2d 551, 554 (1st Cir.1980), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

As to the second prong of the test, our Court of Appeals has indicated that "[i]n order to show the likelihood of substantial competitive harm, it is not necessary to show actual competitive harm. · Actual competition and the likelihood of substantial competitive injury is all that need be shown." *Gulf & Western Industries, Inc., v. United States,* 615 F.2d 527, 530 (D.C. Cir.1979). Plaintiff in its Memorandum also suggests that *Gulf and Western* sets out a third test for substantial competitive injury: "[when] the information to be released is of the type not usually made available to the public *by the submitter of the information."* Plaintiff's Memorandum at 16 (emphasis added), further citing *National Parks, supra,* 498 F.2d at 766–67.

The requirement that AT & T–IS demonstrate that it faces actual competition seems satisfied by the fact that no less than eight of its competitors have sought the disputed information by way of FOIA requests. What remains is really the crux of this case—the likelihood of substantial competitive injury to AT & T–IS upon release of the information in dispute. The Court of Appeals has noted that:

> [c]onclusory and generalized allegations are indeed unacceptable as a means of sustaining the burden of non-disclosure under the FOIA, since such allegations necessarily elude the beneficial scrutiny of adversary proceedings, prevent adequate appellate review and generally frustrate the fair assertion of rights under the act."

*National Parks and Conservation Association v. Kleppe,* 547 F.2d 673, 680 (D.C.Cir. 1976). AT & T–IS, which by this reverse-FOIA action seeks to justify non-disclosure, has met this requirement by submitting detailed explanations for its conclusion that release of this information could inure to its competitors' benefit and result in sub-

stantial competitive injury to the company. *See* Plaintiff's Memorandum at 17–36. GSA argues in opposition that AT & T–IS' suggestions of competitive injury are speculative and conclusory. Defendant's Memorandum at 13–18. Given the limited scope of the Court's review, the matter hinges on the following question: was the GSA's determination that the information is properly released (i.e. disclosure does not present a likelihood of substantial competitive injury) arbitrary, capricious or an abuse of discretion?

Plaintiff makes plausible arguments for its claim that competitive injury may result from disclosure. Defendant proffers, *per contra,* the carefully reasoned opinion of Mr. Fuchigami that the predictions of competitive injury were too speculative to be countenanced.

Mr. Fuchigami has for four and one-half years been Director of the Office of Information Resources Procurement, Office of Information Resources Management (OIRM), General Services Administration. Before coming to GSA, Mr. Fuchigami was Principal Assistant for Automatic Data Processing Procurement to the Office of the Army Chief of Staff and then was head of Logistics Resources Management, Pacific Command for the Army. Mr. Fuchigami has a Master of Science Degree in Management Science, specializing in procurement and contracting.

Mr. Fuchigami's declaration, confirmed by the administrative record,[10] indicates that he reviewed, discussed with staff and counsel, and carefully evaluated AT & T–IS' objections to disclosure, and indeed, honored those objections with respect to many documents. His conclusion that release of the documents here in dispute did not present a likelihood of substantial competitive injury is amply supported by the record and undisputed facts. As Mr. Fuchigami recited in support of his determination and plaintiff does not persuasively dispute, future ASP contracts will not contain the switch management center included in

---

10. *See, e.g.,* Letter from Harry H. Fuchigami to Stanford Miller (April 9, 1985), Exhibit 3 to Defendant's Memorandum.

the New England contract, and will differ significantly as to local conditions and requirements and applicable tariff rates. Mr. Fuchigami reasonably concluded that these factors would undercut competitors' ability to use the released information against AT & T–IS in future bids. *Cf. J.H. Lawrence Co. v. Smith,* Civil Action Nos. 81–2993, 82–0361, slip op. (D.Md. November 10, 1982) (releasing unit pricing information for one of a series of contracts when significant contract variables would undercut competitors' ability to use the information to competitive advantage). Moreover, and significantly, AT & T–IS' counsel did not at oral argument dispute that GSA could in the future purchase the units through individual buys, rather than in the aggregate—and that the prevailing bid price for the unit would be released as a matter of course. Under these circumstances, it cannot be said that GSA's determination (per Mr. Fuchigami) to release the information was arbitrary and capricious. To paraphrase the Court of Appeals for the 11th Circuit, if, after APA review, agency action is found to be inappropriately characterized as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence in the record, "the reviewing court cannot reverse the findings of the agency on the basis that it would have decided [or *might* have felt justified in deciding] the case differently." *Home Health Services of the U.S., Inc. v. Schweiker,* 683 F.2d 353, 357 (11th Cir.1982).

■ In addition, defendant correctly notes that a factor to be considered is whether or not the information is customarily released to the public. There is a strong public interest in release of component and aggregate prices in Government contract awards, and

> [d]isclosure of prices charged the Government is a cost of doing business with the Government. It is unlikely that companies will stop competing for Government contracts if the prices contracted for are disclosed.... Adequate information enables the public to evaluate the wisdom and efficiency of federal programs and expenditures.

*Racal-Milgo Government Systems, Inc. v. Small Business Administration,* 559 F.Supp. 4, 6 (D.D.C.1981); *see also J.H. Lawrence Co. v. Smith, supra;* Federal Acquisition Regulation, 48 C.F.R. § 15.-1001(c)(1)(iv) (1984) (emphasis added) (contracting officer shall, once contract has been awarded, notify unsuccessful offerors, such notice to include "items, quantities and *unit prices* of each award"). Mr. Fuchigami's declaration reveals that he acted on these principles and the more general principle that the FOIA presumes release of requested documents absent compelling demonstration that information falls within the ambit of an FOIA exemption.

As to plaintiff's contention that the customary release of similar information by GSA is immaterial and that the customary public release (or, as here, *non*-release) by the *submitter* of the information should be determinative, our Court of Appeals has stated that:

> [w]hether particular information would customarily be disclosed to the public by the person from whom it was obtained is not the only relevant inquiry in determining whether that information is "confidential" for purposes of § 552(b)(4). A court must also be satisfied that non-disclosure is justified by the legislative purpose which underlies the exemption.

*National Parks, supra,* 498 F.2d at 767. Here the Court is not satisfied that "non-disclosure is justified by the legislative purpose which underlies the exemption;" neither party disputes that disclosure of prices in a successful government contract bid is customary, and Congress could not reasonably have intended otherwise by Exemption 4.

■ In short, GSA did not act arbitrarily and capriciously in determining that release of the contested documents posed no substantial likelihood of competitive injury to AT & T–IS, and that the information thus was not "confidential information" protected from mandatory disclosure by FOIA Exemption 4.

### B.

■ In view of the conclusion that FOIA Exemption 4 does not operate to protect

the disputed documents from mandatory disclosure, it is unnecessary to belabor plaintiff's contention that the Federal Acquisition Regulation ("FAR") prohibits GSA's discretionary disclosure of the materials. The FAR at 48 C.F.R. § 15.1001 permits contracting officers to furnish unsuccessful offerors with notices regarding the award of a contract. Although such notices may include information regarding the contract awarded, "[i]n no event shall an offeror's cost breakdown, profit, overhead rates, trade secrets, manufacturing processes and techniques, or other confidential business information be disclosed to any other offeror." FAR § 15.1001(c)(1)(v) (1984). The regulation states that: "[d]ebriefing [of unsuccessful bidders] shall not reveal any information that is not releasable under the Freedom of Information Act." FAR § 15.1003(b) as amended 50 Fed.Reg. 1741 (January 11, 1985). Conversely, since, as here determined, the information at issue is not protected from mandatory disclosure under FOIA, § 15.-1003(b) does not preclude disclosure of the information by the defendant. *See also* FAR § 15.1001(c)(1)(iv), indicating that disclosure of unit prices, as well as total contract price, is customary.

## C.

Finally, it is necessary to briefly consider plaintiff's alternative argument that FOIA Exemption 3, in combination with the Trade Secrets Act, protects the contested documents from mandatory disclosure. Documents are, under Exemption 3, protected from mandatory disclosure when they are: "specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3) (1982). Plaintiff contends that the question of whether the Trade Secrets Act is such an Exemption 3 statute has not been resolved in this jurisdiction.

Our Court of Appeals has stated that:

in our view ... the third exemption "does not incorporate section 1905 into the FOIA in such a way as to make section 1905 broader than the fourth exemption." [citation omitted], The third exemption requires that matters be *"specifically* exempted from disclosure by statute" [citation omitted] yet section 1905 by its own terms is a statute of general applicability and not one that specifically defines or categorizes the information to be exempted within the meaning of the third exemption.

*National Parks II, supra,* 547 F.2d at 686. *See also CNA Financial Corp. v. Donovan,* 2 GDS (P–H) ¶ 82,107 (D.D.C.1981).

Plaintiff cites *Worthington Compressors Inc. v. Costle,* 662 F.2d 45 (D.C.Cir. 1981), however, in which the Court cited the Supreme Court's decision in *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) and stated that

[i]f [on remand] the district court finds that Exemption 4 is applicable to the information in this case, it will not have to rule on appellants' Exemption 3 claims. If, however, the court finds Exemption 4 to be inapplicable, it should proceed to determine whether the Trade Secrets Act ... is a withholding statute.

*Worthington Compressors, Inc.,* 662 F.2d at 55–56.

■ In short, it may be as plaintiff suggests, that the question of whether the Trade Secrets Act is an Exemption 3 statute remains open in this jurisdiction. Under the circumstances of this case, however, Exemption 3 can provide plaintiff no relief where it has been determined that Exemption 4 is inapplicable. As noted by the Court of Appeals in *Worthington Compressors,*

if Exemption 4 does not apply and if § 1905 is construed to be broader than Exemption 4 so as to apply to the information, FOIA may provide the necessary "authorization by law" to satisfy § 1905. (In *Chrysler Corp.,* the Supreme Court called this a "theoretical possibility" that "is at most of limited practical signifi-

cance in view of the similarity of language between Exemption 4 and the substantive provisions of § 1905." [citation omitted] ... *The real test of the relationship between Exemption 4 and § 1905 will come where, unlike here, an agency's regulations permit it to disclose information even where Exemption 4 is applicable.* In such a case, the issues would be raised whether the Trade Secrets Act also applied and, if so, whether disclosure was authorized by law within the meaning of § 1905.

*Id.* at 55 n. 59 (emphasis added). Here, by contrast, Exemption 4 has been determined to be inapplicable. Moreover, the parties agree that Exemption 4 and section 1905 of the Trade Secrets Act are co-extensive. Accordingly, the determination that Exemption 4 is inapplicable compels as well the conclusion that section 1905 of the Trade Secrets Act is inapplicable. Thus, under these circumstances, section 1905 cannot by joinder with FOIA Exemption 3 protect from mandatory disclosure information that has been determined to be without Exemption 4 protection.

For all of these reasons, the accompanying order will grant defendant's motion for summary judgment and deny plaintiff's cross motion for summary judgment.