CENTER FOR PUBLIC INTEGRITY,
Plaintiff,

v.

DEPARTMENT OF ENERGY,
Defendant.

No. 00CV2803(HHK).

United States District Court,
District of Columbia.

March 26, 2002.

Marc Eric Miller, McLeod, Watkinson &
Miller, Watkinson & Miller, Peter Newbatt
Smith, Washington, DC, for Plaintiff.

Anne L. Weismann, U.S. Department of Justice Civil Division, Youngjae Lee, U.S. Department of Justice Civil Division, Federal Programs Branch, Washington, DC, for Defendant.

## MEMORANDUM

KENNEDY, District Judge.

By this action brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Center for Public Integrity ("CPI") seeks to compel the Department of Energy ("DOE") to disclose records in its possession related to the federal government's sale of Naval Petroleum Reserve Numbered–1 ("NPR–1"). Before the court are the parties' cross-motions for summary judgment. Upon consideration of the motions, the respective oppositions thereto, and the summary judgment record, the court concludes that CPI's motion must be granted because DOE has not met its burden of showing that the records are exempt from FOIA's disclosure requirements.

## I. BACKGROUND

### A. Legal Framework

■ Congress enacted FOIA to promote "a policy of broad disclosure of Government documents" and "ensure 'an informed citizenry, vital to the functioning of a democratic society.'" *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 872 (D.C.Cir.1992) (quoting *FBI v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982) (internal citations omitted)). In so doing, however, Congress acknowledged that "legitimate governmental and private interests could be harmed by release of certain types of information." *Id.* In order to balance these competing interests, Congress crafted nine exemptions to FOIA

under which an agency may withhold information. *See* 5 U.S.C. § 552(a)(4)(B) & (b)(1)-(9). In the present case DOE invokes Exemptions 3 and 4, *see id.* at § 552(b)(3) & (b)(4), as grounds for denying CPI's request for information relating to the sale of NPR–1.

Under Exemption 3, an agency may withhold records "specifically exempted from disclosure by statute" if the statute affords the agency no discretion on disclosure, establishes particular criteria for withholding the information, or refers to the particular types of material to be withheld. *See id.* at § 552(b)(3)(A) & (B). The Supreme Court has established a two-part test for determining whether information is exempt from disclosure under Exemption 3: 1) the asserted statute must qualify as an exemption statute; and 2) the information requested must fall within the statute. *See CIA v. Sims,* 471 U.S. 159, 167, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). CPI concedes that the statute relied upon by DOE as the basis for withholding the NPR–1 records, Section 821(b)(m) of the National Defense Authorization Act for Fiscal Year 1997[1], is an exemption statute for purposes of Exemption 4, but contends that the records do not fall within the statute.

■ Under Exemption 4, an agency may withhold from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Under the law of this Circuit, information is "confidential" for purposes of Exemption 4 if it is submitted "involuntarily" and is "likely" to 1) "cause substantial harm to the competitive position of the person from whom the information was obtained"; or 2) "impair the government's ability to obtain

---

1. Section 821(b) amended section 303B(m) of the Federal Property and Administrative Services Act of 1949 ("FPASA") and is codified at 41 U.S.C. § 253b(m).

necessary information in the future." *Nat'l Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974).

### B. Factual Background

NPR–1 is a tract of approximately 47,-000 acres of land located in Elk Hills, California, 25 miles south of Bakersfield. In the National Defense Authorization Act for Fiscal Year 1996 ("the Act"), Pub.L. No. 104–106, § 3412(a), 110 Stat. 186, 631–32 (1996), Congress directed DOE to sell "all right, title, and interest of the United States in and to all lands owned or controlled by the United States" inside NPR–1. The Act required DOE to "set the minimum acceptable price for the reserve," to solicit offers for the purchase of the reserve, and then to identify the "highest responsible offer or offers" that "meet or exceed the minimum acceptable price. . . ." *Id.* at § 3412(d)(3), (f)(2).

The Act additionally required DOE to "retain the services of an investment banker or an appropriate equivalent financial adviser to independently administer" the sale of NPR–1 "in a manner that maximizes sale proceeds to the Government" and "in a manner consistent with commercial practices." *Id.* at 3412(e)(1). Pursuant to this provision, DOE hired C.S. First Boston and Petrie Parkman as financial advisers. These advisers contacted over 200 companies from the United States and abroad to assess their potential interest in NPR–1, prepared and distributed a marketing brochure and data sets to interested parties, held technical briefings, and required prospective participants in the sale to execute confidentiality agreements.

DOE then issued a Solicitation of Offers for the sale of the government's interest in NPR–1, structured as one operating working interest representing seventy-four percent of the government's interest, and thirteen non-operating working interests each representing two percent of the govern-ment's interest. Qualified parties were allowed to submit bids on one, some, or all of the segments and to submit multiple alternative bids. The offer form that DOE required the offerors to submit stated "Privileged, Confidential, and Highly Sensitive Divestiture Process Information." On October 6, 1997, DOE announced that it had accepted the offer of Occidental Petroleum Corporation to purchase the reserve for $3.65 billion, making the sale the largest privatization in United States history.

In January 2000, CPI filed a FOIA request with DOE, seeking in pertinent part "[t]he names of all entities that placed bids on NPR–1, any portion thereof, and the amounts of all bids." Pl.'s Compl. Ex. 1 at 1. In April 2000, DOE's Office of Fossil Energy ("FE") issued a determination letter denying this request on the grounds that the records sought were exempt from disclosure under Exemption 4 of FOIA. On CPI's appeal, DOE's Office of Hearings and Appeals ("OHA") held that the records were not exempt under Exemption 4 and remanded the matter to FE with instructions "to either release all or part of the withheld information or provide a new justification for any continued withholdings." Pl.'s Compl. Ex. 3 at 8.

On remand, FE denied CPI's request again, this time relying on Exemption 3 in addition to Exemption 4. On CPI's second appeal, OHA held that the records were exempt from disclosure under Exemption 3 and affirmed FE's denial of CPI's request. This suit followed.

## II. ANALYSIS

### A. Standard of Review

FOIA provides for de novo review by the district court, and places the burden on "the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). The agen-

cy may meet this burden by submitting affidavits or declarations that describe the withheld material in reasonable detail and explain why it falls within the claimed FOIA exemptions. *See Summers v. Dep't of Justice,* 140 F.3d 1077, 1080 (D.C.Cir. 1998). Where the pleadings and affidavits or declarations show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law, summary judgment is the appropriate mechanism for resolving FOIA disclosure disputes. *See* Fed.R.Civ.P. 56(c); *Alyeska Pipeline Serv. Co. v. EPA,* 856 F.2d 309, 313–14 (D.C.Cir.1988). In addition, a district court may determine if a FOIA exemption is properly invoked on the basis of affidavits or declarations submitted by the government, *see Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978), so long as the affidavits are not conclusory and describe the justification for withholding the requested records "in sufficient detail to demonstrate that the claimed exemption applies." *Carter v. Dep't of Commerce,* 830 F.2d 388, 392 (D.C.Cir.1987).

## B. Exemption 3

DOE argues that Section 821(b)(m) permits it to withhold the records CPI seeks under Exemption 3. Section 821, entitled "Prohibition on Release of Contractor Proposals Under Freedom of Information Act," provides that "a proposal in the possession or control of an executive agency" may not be disclosed under FOIA. 41 U.S.C. § 253b(m)(1).[2] The term "proposal" is defined as "any proposal, including a technical, management, or cost proposal, submitted by a contractor in response to the requirements of a solicitation for a competitive proposal." *Id.* at § 253b(m)(3).

DOE argues that the records requested by CPI fall within Section 821(b)(m) because the names of the bidders for NPR–1 and the amounts of their bids constitute a proposal to "enter into a contractual relationship with the government," Def.'s Mot. at 10, and were submitted "in response to the requirements of a solicitation for a competitive proposal," 41 U.S.C. § 253b(m)(3). CPI contends that the records do not fall within Section 821(b)(m) because the term "contractor" refers to parties providing property or services to the government, not parties purchasing property or services from the government. In other words, CPI argues that Section 821(b)(m) applies to government procurement contracts, not to government sales contracts.

In support of its construction of Section 821(b)(m), CPI points to the statutory scheme of which the provision is a part, noting that the subchapter containing it is entitled "Procurement Provisions," *see* Title 41, Ch.4, Subchapter IV; and that the first section of the subchapter states that "[t]he purpose of this subchapter is to facilitate the *procurement* of property and services." 41 U.S.C. § 251 (emphasis added). CPI also points out that *sales* of government property are governed by a separate section of FPASA, codified at 40 U.S.C. § 484 (governing disposal of surplus property). In light of this organizational structure and nomenclature, CPI contends that Section 821(b)(m) cannot be seen as "*specifically* exempt[ing] from disclosure" records relating to the sale of NPR–1 such that the records may be withheld under Exemption 4. 5 U.S.C. § 552(b)(3) (emphasis added).

**2.** The statute provides an exception allowing disclosure where the proposal "is set forth or incorporated by reference in a contract entered into between the agency and the con-

tractor that submitted the proposal." 41 U.S.C. § 253b(m)(2). The parties agree that this exception does not apply to the present case.

DOE counters that statutory interpretation must center on the text of the provision at issue, *Carter,* 530 U.S. at 271, 120 S.Ct. 2159, and argues that the text of Section 821(b)(m) indicates that "proposal" should be construed broadly to include both procurement and sales contracts. DOE points to the modification of "proposal" with the word "any" and to the lack of any explicit limitation to procurement contracts, *see* 41 U.S.C. § 253b(m)(3), as evidence that the "plain meaning" of Section 821(b)(m) covers the records of the sale of NPR–1. Because recourse to other interpretive tools is permitted only if the text of the provision is ambiguous, DOE argues that CPI cannot rely on chapter titles or the overarching statutory scheme to support its contrary interpretation of Section 821(b)(m). *See Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 211, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (stating that "[t]he title of a statute ... cannot limit the plain meaning of the text"); *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (noting that headings and titles are useful for "interpretative purposes" only if they "shed light on some ambiguous word or phrase").

■ DOE's argument is unpersuasive. While it is true that the text of Section 821(b)(m) does not expressly limit its reach to "procurement" contracts, neither does it expressly extend its reach to "sales" contracts. DOE places talismanic weight on the term "procurement," but the absence of this term cannot alone can decide the issue; the provision must be interpreted by determining the meaning of those words that *are* present in the text. In support of its interpretation DOE has pointed only to one such word, "any." However, "any" in the context of the sentence in which it occurs functions simply as an article; the same meaning would be imparted by the phrase "a proposal." Moreover, even if "any" carried some interpretive value, it is not the only word modifying "proposal" in the provision; indeed, if it were the provision would be highly redundant, as it would read "the term 'proposal' means any proposal." Instead the definition continues with the phrase "submitted by a contractor in response to the requirements of a solicitation for a competitive proposal." 41 U.S.C. § 253b(m)(3). As the parties do not debate that the information CPI seeks was submitted "in response to the requirements of a solicitation" for bids on NPR–1, the determinative term for our purposes is "contractor."

The initial question is thus whether "contractor" as used in Section 821(b)(m) is ambiguous.[3] The statute does not provide a definition, but *Webster's New World College Dictionary* provides three:

1) one of the parties to a contract;

2) a person who contracts to supply certain materials or do certain work for a stipulated sum, esp. one who does so in any of the building trades;

3) a thing that contracts, narrows, or shortens; esp. a muscle that contracts. *Id.* at 302 (3rd ed.1997). DOE's interpretation of Section 821(b)(m) assumes without argument that the first definition is the applicable one. However, the Supreme Court has recognized that where a term has more than one definition, its use in a specific context may be ambiguous. *See Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). In *National Railroad Passenger Corporation v. Boston & Maine Corporation,* the Court considered

---

**3.** DOE's argument that the records sought by CPI fall within Section 821(b)(m) because the bidders and the government entered into "a contractual relationship" is therefore inapposite.

the meaning of the term "required" in 45 U.S.C. § 562(d). The Court found that "[t]he existence of alternative dictionary definitions of the word 'required,' each making some sense under the statute, itself indicates that the statute is open to interpretation." *Id.* at 418, 112 S.Ct. 1394. Likewise, in this case the first two dictionary definitions of "contractor" are both plausible meanings under Section 821(b)(m).

■ Where a term in a statute is ambiguous, it is appropriate to examine chapter titles and related statutory provisions to shed light on its meaning. *See Trainmen,* 331 U.S. at 528–29, 67 S.Ct. 1387 (stating that titles are useful for interpretation "where they shed light on some ambiguous word or phrase"); *Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 615 (D.C.Cir.1997); *Ass'n of American R.R. v. Costle,* 562 F.2d 1310, 1316 (D.C.Cir.1977). Both of these sources indicate that the second *Webster's* definition of contractor more accurately reflects Congress' intent in enacting Section 821(b)(m). The surrounding provisions in the enacting statute deal with procurement, *see* Pub.L. No. 104–121, Title VIII §§ 801–33, 110 Stat. 2422, 2603–16 (1996), and the sections surrounding where Section 821(b)(m) was inserted in FPASA also deal with procurement, *see* FPASA, Title 3, 41 U.S.C. §§ 251–66. Moreover, the title of the subchapter containing the provision is entitled "Procurement Provisions," *see* Title 41, Ch.4, Subchapter IV, and the first section of the subchapter states that the statute's purpose is to "facilitate the *procurement* of property and services." 41 U.S.C. § 251 (emphasis added). This language shows Congress' intent for this subchapter to apply specifically to government procurement contracts; no mention is made of sales contracts. In fact, sales of government property are governed by a separate chapter, 40 U.S.C. § 484.

DOE attempts to dismiss the interpretative value of 41 U.S.C. § 251 on the grounds that it is merely a "preamble." However, Section 251 does not exhibit any of the telltale characteristics of a preamble: it was not placed near the beginning of the enacting statute, it does not contain Congressional findings, and it does not use formulaic language such as a series of clauses beginning with "whereas." *See Costle,* 562 F.2d at 1316. Even assuming *arguendo* that Section 251 is a preamble, the D.C. Circuit has recognized that there is "no doubt" that a preamble "contributes to a general understanding of a statute" and can provide guidance as to "legislative intent" if the operative parts of the statute are ambiguous. *See id.* at 1316, *citing Yazoo & M.V.R.R. v. Thomas,* 132 U.S. 174, 174–75, 10 S.Ct. 68, 33 L.Ed. 302 (1889) (finding that "the preamble cannot enlarge or confer powers, nor control the word of the act, *unless they are doubtful or ambiguous*") (emphasis added).

DOE also asserts that its interpretation of Section 821(b)(m) furthers the provision's purpose, citing a committee report in which Congress stated that the provision was enacted to reduce "a significant administrative burden on federal agencies receiving [FOIA] requests for release of contractor proposals...." H.R.Rep. No. 563, 104th Cong., 2d Sess., at 327 (1996). However, this statement raises the same issues addressed above concerning the meaning of "contractor" under the statute. Moreover, applying Section 821(b)(m) solely to procurement contracts is perfectly consistent with this purpose, as it would in itself achieve a significant reduction in the administrative burden imposed by FOIA. The fact that applying the provision to sales contracts also would achieve an even greater reduction does not render our interpretation contrary to the purpose of the statute.

■ Finally, we note that although DOE's interpretation of "contractor" matches the first dictionary definition of the word, the second definition is more in keeping with the way the word is used in both common and legal parlance, especially in the context of government contractors. *See Church v. General Motors Corporation,* 74 F.3d 795, 799 (7th Cir.1996) (noting that "[a]lthough in the most broad and generic sense of the word, every party to a contract could be said to be a 'contractor,' the term is most commonly used in a more precise manner to designate one who undertakes the performance of work or services for another"); *see also* Blacks Law Dictionary (7th ed.1999) (defining "contractor" as: "1. a party to a contract. 2. *more specif., one who contracts to do work or provide supplies for another.*") (emphasis added). Thus, "contractor" when used in this context means a private party with whom the government has a *procurement* contract for products or services, not a private party purchasing government land.

## C. Exemption 4

DOE argues that the records requested by CPI may be withheld under Exemption 4 because they are likely to 1) cause "substantial harm to the competitive position of the person from whom the information was obtained;" and/or 2) " impair the government's ability to obtain necessary information in the future." *Morton,* 498 F.2d at 770.

### 1. Competitive Harm

DOE contends that release of the records relating to the sale of NPR–1 will cause substantial competitive harm because the records provide key information about a bidder's business strategy to its competitors. Release of the identity of a bidder will have this effect, DOE argues, because it will provide insight into the bidder's plan to add to its reserves generally, and specifically to initiate or enhance its California holdings. Thus, release of a bidder's name will inform the bidder's competitors that the bidder is likely to be a competitor in future sales of the same type.

Release of the total amount of a bidder's offer will also provide information about the bidder's business strategies, DOE argues, by revealing the bidder's valuation methodologies. According to DOE, these valuation methodologies could be discerned by competitors by comparing the total bid amount with information already in the public domain regarding the prospects for development of NPR–1.

■ DOE's assertions are not supported by logic or the evidence. DOE admits that the amount of a bidder's offer is based on multiple factors, including "reserve estimates, future cash flow price projections, and risk factors associated with the reserves." Pl.'s Compl. Ex. 2 at 7. Yet DOE argues that if the total amount of a bidder's offer is known, then the bidder's competitors can reconstruct each factor in the bidder's calculations in order to discern its valuation methodology. As CPI astutely points out, this is tantamount to attempting to solve for $\times$ in the equation $\times + y + z = \$3.65$ billion without knowing the other variables.

The courts of this Circuit have viewed such arguments with skepticism, generally requiring agencies to disclose information under Exemption 4's competitive harm prong unless they are able to demonstrate that release of the information would be of substantial assistance to competitors in estimating and undercutting a bidder's future bids. *See Gulf & Western Indus., Inc. v. U.S.,* 615 F.2d 527, 530 (D.C.Cir. 1979). The district courts have required disclosure of both aggregate and unit prices under this standard. In *Brownstein Zeidman and Schomer v. Department of Air Force,* 781 F.Supp. 31 (D.D.C.

1991), the defendant agency sought to withhold the unit prices for computer components provided by a successful bidder under Exemption 4, arguing that release of the prices "would allow [the bidder's] competitors to calculate [the bidder's] profit margin and consequently underbid [the bidder]." *Id.* at 33. The court held that this claim was "highly speculative" and ordered the release of the price information. *Id.* (citing *AT & T v. General Servs. Admin.*, 627 F.Supp. 1396 (D.D.C. 1987), rev'd on other grounds, 810 F.2d 1233 (D.C.Cir.1987)). *See also Racal–Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F.Supp. 4, 6 (D.D.C.1981) (rejecting agency's argument that disclosure of unit prices for computer equipment would "give a competitor insight into the supplier's pricing strategy or pricing structure").

Those cases in which the courts have not required disclosure of information relating to government contractors typically involved requests not for prices but for more sensitive data, such as audits of private concessions in national parks, *see Morton*, 498 F.2d 765, profit margins and inventory balances, *see Braintree Elec. Light Dep't v. Dep't of Energy*, 494 F.Supp. 287, 290 (D.D.C.1980), and appraised values for customs duties assessment of imported parts, *see Timken Co. v. U.S. Customs Serv.*, 491 F.Supp. 557, 559 (D.D.C.1980). In the only decision permitting an agency to withhold aggregate bids under Exemption 4, *Raytheon Company v. Department of the Navy*, No. 89–2481, 1989 WL 550581 (D.D.C.1989), the bidder provided specific evidence that factually demonstrated how the bidder's valuation methodologies could be derived from the information sought. *See id.* at *4–6.

■ DOE has not requested such detailed information nor provided such detailed explanations in the present case. DOE presents only declarations from unsuccessful bidders for NPR–1 which restate the allegations of competitive harm made in the briefings. Moreover, DOE· has failed to refute CPI's argument that the passage of time since the NPR–1 offers were submitted, and the recent changes that have occurred in the petroleum industry, have changed the competitive landscape. Courts have recognized that the passage of time can mitigate the potential for harm that might otherwise have resulted from the release of commercial information. *See Teich v. FDA*, 751 F.Supp. 243, 253–54 (D.D.C.1990) (noting that the area of medicine at issue had "changed substantially in the intervening years" since the requested documents were created, and that the agency had not introduced "evidence which would demonstrate the current significance" of the documents). DOE itself acknowledges that world oil prices are "volatile." A bidder's competitor would therefore be naive to assume that the bidder's business strategies and valuation methodologies remain the same over time in the face of changing market conditions.[4]

### 2. Impairment of Government's Interest

■ DOE argues that release of the records relating to the sale of NPR–1 is likely to impair the government's ability to obtain future bids in similar sales by revealing "the spread between offers." Def.'s Mot. at 8. Knowledge of this spread will prompt bidders' competitors to offer lower bids in the future, DOE contends. Furthermore, DOE asserts that the court

---

4. The declarations submitted by unsuccessful bidders also assert that the parties had an expectation of confidentiality regarding the bidding process. However, the test of confidentiality is an objective one and the parties' expectations are not determinative. *See Racal–Milgo*, 559 F.Supp. at 6, *citing Morton*, 498 F.2d at 767.

should defer to DOE's own determination that this impairment will occur.

 DOE's arguments are without merit. Deference is only granted to an agency's own determination of impairment in so-called "reverse FOIA" case in which the plaintiff challenges the agency's determination that disclosure will *not* impair its interests. *See Hercules, Inc. v. Marsh*, 839 F.2d 1027 (4th Cir.1988); *General Elec. Co. v. NRC*, 750 F.2d 1394 (7th Cir. 1984). The rationale for showing deference in such cases is that the agency "has an incentive not to release information which will impair its future ability to successfully contract," and therefore if the agency is willing to release information, it can be safely assumed that the agency is acting to protect its ability to contract in the future. *McDonnell Douglas Corp. v. NASA*, 981 F.Supp. 12, 15 (D.D.C.1997). This rationale clearly does not apply where an agency is withholding information.

More importantly, the courts of this Circuit have found that the benefits accruing to bidders from contracting with the federal government make it unlikely that an agency's future contracting ability will suffer impairment due to disclosure of price information. *See id.* at 15 (finding that release of contract price information would not cause impairment since "government contracting involves millions of dollars"); *Racal–Milgo*, 559 F.Supp. at 6 (finding no impairment because "[d]isclosure of prices charged the government is a cost of doing business with the Government" and "[i]t is unlikely that companies will stop competing for Government contracts if the prices contracted for are disclosed"). As OHA recognized in rejecting this ground for withholding the NPR–1 records, "the benefits of doing business with the government can be considerable and are generally sufficient to ensure that firms will continue to submit bids even if

these bids are made public." Pl.'s Compl. Ex. 4 at 6.

### III. CONCLUSION

For the foregoing reasons, the court concludes that DOE has not met its burden in showing that it may withhold the records CPI seeks under Exemptions 3 or 4 of FOIA. Consequently, DOE's motion for summary judgment is denied and CPI's motion for summary judgment is granted. An appropriate order accompanies this memorandum.

### JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated in the court's memorandum opinion docketed this same day, it is this 25th day of March, 2002, hereby

**ORDERED** and **ADJUDGED** that defendant disclose the names of all entities that placed bids on NPR–1, any portion thereof, and the amounts of all bids.