Mrs. David ORLIKOW, et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 80–3163.

United States District Court,
District of Columbia.

Jan. 19, 1988.

James C. Turner, Washington, D.C., for plaintiffs.

Asst. U.S. Atty. John C. Martin, Washington, D.C., for defendant.

## OPINION

JOHN GARRETT PENN, District Judge.

Plaintiffs filed this Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.*, suit against the United States for injuries they sustained from an alleged experimentation/research project funded by the Central Intelligence Agency (CIA). Defendant characterizes the actions of Dr. Ewen Cameron, the psychiatrist who utilized the CIA funds for his research, as psychiatric treatment which falls within the parameters of acceptable medical standards. The case is before the Court on defendant's motion for summary judgment. Defendant has propounded numerous arguments supported by a plethora of documents to which plaintiffs have parried with countervailing arguments and evidence.[1] Despite the copious paper filed in this motion, the issues can be narrowed to: (1) whether defendant's actions fall within the discretionary function exception to the FTCA, (2) whether the statute of limitations precludes suit by plaintiffs, (3) whether the actions fall within the foreign country exception and, (4) whether the CIA can be liable for the actions of an independent contractor. A thorough analysis of the case must begin with sorting through the admitted facts and those issues which remain in dispute. Against this framework the relevant law is applied.

## I. BACKGROUND

The facts submitted in this case are labyrinthine and generally not disputed. The pivotal issue, however, pertaining to whether Dr. Cameron's research was medically sound therapy or experimentation, is plainly in dispute. In their Amended Complaint the plaintiffs allege, (1) negligent failure of supervision and control over CIA employees, (2) negligent and reckless funding of hazardous experiments, (3) liability for CIA funding of medical malpractice. Amended Complaint at 19–24. A brief overview of the case will provide the context in which this action arose.

In the 1950s, the CIA initiated an expansive covert research project, known as MKULTRA, which was designed to investigate chemical and biological warfare. The project was established to counter Soviet and Chinese advances in brainwashing and interrogation techniques. Various subprojects were contracted out to research institutions. Because the Agency funded the research indirectly, participating individuals often were unaware of the CIA involvement. *C.I.A. v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 1884, 85 L.Ed.2d 173 (1985). An April 3, 1953 memorandum reads:

> Aside from the offensive potential, the development of a comprehensive capability in this field of covert chemical and biological warfare gives us thorough

---

1. This case presented unusual discovery problems for the plaintiffs. Normally, a party preparing a case for trial is entitled to fairly broad discovery. But, this case involves alleged actions by the Central Intelligence Agency (CIA), while purportedly operating a research project, code-named MKULTRA, that was established to counter Soviet and Chinese advances in brain-washing between 1953 and 1966. Persons who have sought to obtain information on the project, and who filed an action pursuant to the Freedom of Information Act, 5 U.S.C. § 552, also have been denied certain information concerning the program. *See C.I.A. v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985).

knowledge of the enemy's theoretical potential thus enabling us to defend ourselves against a foe who might not be as restrained in the use of these techniques as we are.[2]

Defendant's Motion Exhibit [2]

Many of the early projects involved the use of Lysergic Acid Diethyamide (LSD) and other drugs and some involved experimentation on unwitting human subjects. *Id.* 105 S.Ct. at 1884, n. 2. A few tragic deaths occurred from these actions.[3] Defendant admits that as a result of one specific death, critical letters were given by Director Dulles to the Chief, TSS, Mr. Gibbons, the Chief of the Technical Operations Branch of TSS, Colonel Drum, and the Chief of the Chemical Division of TSS, Dr. Gottlieb. Defendant's Statement of Material Facts as to Which There Is No Genuine Issue, hereinafter "Defendant's Statement" par. 20. Additionally, after the Olson death, Director Dulles "made it clear that these projects should be handled under adequate medical supervision." Defendant's Statement par. 22.

In 1955, the CIA set up a secret front organization, known as the Society for the Investigation of Human Ecology (SIHE), to fund further studies. CIA employee, Dr. John Gittinger and Dr. Wolff from Cornell, assisted in the program formation. Approximately a year later, Dr. Gittinger read an article, published in the American Journal of Psychiatry, written by Dr. Ewen Cameron from the Allan Memorial Institute of Psychiatry, and entitled *Psychic Driving*. Defendant's Motion Exhibit 6. The article prompted him to invite Dr. Cameron to submit an application for SIHE research funds. Defendant's Statement pars. 31–32.

The article described a technique administered to individuals who suffered from varying forms of mental disorders. The technique involved the playback of a significant statement made by the patient though the use of a continuous loop tape recorder. Certain methods were utilized to reduce defense mechanisms and "depattern" behavior. These techniques were later detailed in an application for research funds submitted to the SIHE. They included the use of "particularly intensive" electroconvulsive shock, sensory isolation, and drug induced continuous sleep for many days. The application requested funds to improve the technique of heteropsychic driving and to investigate the range of physiological functions which can be changed by these procedures. Among the studies proposed was the use of chemical agents, including LSD, to depattern the individual. Defendant's Motion Exhibit 7. Dr. Cameron characterized his work as the "gateway through which he might pass to a new field of psychotherapeutic methods." *Psychic Driving*, 112 Am.J.Psy. 502 (January, 1956). Whether in fact the methods used in Dr. Cameron's therapy, particularly those related to "preparing" the patient for Psychic Driving, were therapeutic, ethical or within the standard of medical care, is a pivotal issue disputed in this case.

On March 4, 1957, the CIA approved the Cameron grant as MKULTRA Subproject 68 for the period of time from March 18, 1957 to June 30, 1960. Defendant's Statement par. 40. The nine plaintiffs [4] in this

**2.** The memorandum refers to two "well-defined" fields of endeavor earmarked by the CIA. The first is listed as research to develop a capability in the covert use of biological and chemical materials. The second field, although cited to in the memorandum was erased from the exhibit. *See, C.I.A. v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985).

**3.** The CIA was interested in LSD research because of the concern that the Russians or the Chinese might use it on Americans. In the 1950s the drug was much less prevalent in the U.S.A. and its effects less known. The CIA decided that it needed to test LSD on unwitting subjects and selected certain government em-

ployees to experiment with. One of the experiments involving secret testing occurred in November 1953 when LSD was put in liquor which was served to a group of scientists from the CIA and the Army Special Operations. Dr. Frank Olson, one of the subjects, fell or jumped from a hotel window soon after ingesting the LSD. Defendant's Statement of Material Facts As to Which There Is No Genuine Issue pars. 15–20.

**4.** Plaintiffs, all Canadians, are Mrs. David Orlikow, Mr. Jean–Charles Page, Mr. Robert K. Logie, Mrs. Jeanine Huard, Mrs. Lyvia Stadler, Dr. Mary Morrow, Mrs. Rita Zimmerman, Mrs. Florence Langleben and Mr. Louis Weinstein. On April 28, 1986, Mr. Moe Langleben was sub-

action were patients of Dr. Cameron during the grant period. Each was subjected to at least one aspect of the procedure outlined in the application grant. It is undisputed that the plaintiff did not have knowledge of the alleged experimental nature of Dr. Cameron's techniques, however, various forms of consent were given for treatment. On April 12, 1960, after receiving the final grant payment, Dr. Cameron sent a letter to the SIHE, thanking the organization for its assistance and stating that "[t]he help which we have received from your Society during the last several years has been invaluable, and all of us who are engaged in this investigation have a considerable sense of indebtedness to your organization." Defendant's Motion Exhibit 17. The CIA funding period had ended although Dr. Cameron continued his work.

## II. DISCRETIONARY FUNCTION

Defendant asserts, inter alia, that this case must be dismissed because each of the actions alleged are protected by the discretionary function exception under the FTCA. 28 U.S.C. § 2680(a). The issue is jurisdictional. The applicable two pronged clause provides that the Act shall not apply to:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a *discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added).

The discretionary function exception, referred to in the second clause of section 2680(a) "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities

from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). Congress failed to define "discretionary function". The Courts are thereby saddled with the task of giving form to this enigmatic term. The seminal cases that have evolved on the issue assist in the process. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1956) and *Varig Airlines, supra*, are the two leading Supreme Court cases construing the discretionary function.

■ Plaintiffs' complaint states three counts: (1) negligent supervision and control of employees who chose to fund Dr. Cameron, (2) negligent funding of an inherently dangerous activity, ie, human experimentation, and (3) which can be read into the second count, asserts liability for CIA funding of medical malpractice. The second and third count allege extraordinary and malevolent acts which by their very nature are beyond any reasonable discretion that Congress might have envisioned when creating the discretionary exception. *See Glickman v. United States*, 626 F.Supp. 171, 175 (S.D.N.Y.1985).[5] When a decision is made to conduct intelligence operations by methods which are unconstitutional or egregious, it is lacking in statutory or regulatory authority. *Socialist Workers Party v. Attorney General of the United States*, 642 F.Supp. 1357, 1417 (S.D. N.Y.1986). The Court is mindful that an allegation that the employee has ignored any agency practice does not automatically take an activity outside of the discretionary function. *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1197, n. 3 (D.C.Cir.1986). Yet, from another perspective, defendant admits that after the Olson tragedy future projects were to be handled with proper medical guidance. Where the "government official in performing his statutory duties must act without

stituted as a plaintiff for Mrs. Florence Langleben who died.

5. *Glickman* involves alleged acts by the same officials cited in the case at bar. Plaintiff, an American citizen in Paris, alleged that Gottlieb

and Helms gave him a drink, which they had secretly laced with LSD. Additionally, after ingesting the drink he was taken to a hospital and administered electroshock treatment.

reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception to the Tort Claims Act. Conversely, if there is a standard by which his action is measured, it is not within the exception." *Barton v. United States*, 609 F.2d 977, 979 (10th Cir.1979).

The CIA was created to correlate and evaluate intelligence relating to the national security. If the disputed facts were resolved in favor of plaintiffs, the defendant would have acted so far beyond its authority that in any proper construction the action could not be termed discretionary. As one court stated: "Discretion may be as elastic as a rubber-band, but it, too, has a breaking point." *Birnbaum v. United States*, 588 F.2d 319 329 (2d Cir.1978).

 Count one involves negligent supervision of the employees who chose to fund Dr. Cameron's research. Plaintiffs allege action which falls outside the discretionary function exception. To fall outside the exception, the plaintiffs must allege conduct that is sufficiently separable from a decision-making function. *Payton v. United States*, 679 F.2d 475, 482 (5th Cir. 1982). The CIA had authority to choose certain employees as part of the plan or policy of an authorized governmental function. Whether the CIA officials exercised proper control over the MKULTRA program employees is a question distinguishable from any policy decision in implementing the plan. Where a claim alleges negligence by a government official in failing to properly control or supervise another government employee, who in turn commits an *intentional tort*, the negligence claim is barred because it arises out of the intentional tort. Here plaintiffs are suing for negligence in supervision and failure to exercise due care in the selection of employees who would carry out a brainwashing research funding. Selecting incompetent contractors or employees and supervising them in a careless manner are acts of negligence pure and simple. *See Liuzzo v. United States*, 508 F.Supp. 923, 932 (E.D. Mich.1981); *DeLong v. United States*, 600 F.Supp. 331 (D.Alaska 1984); *Gibson v.*

*United States*, 457 F.2d 1391 (3d Cir.1972); *Melton v. United States*, 488 F.Supp. 1066, 1072 (D.C.C.1980).

To hold that these discretionary decisions involve a measure of policy judgment would extend the protection of the exception beyond what Congress intended to protect from judicial second guessing. Every decision involves some measure of discretion, but stretched to an extreme, section 2680 could swallow any waiver of sovereign immunity intended by the Act. *Morici Corporation v. United States*, 500 F.Supp. 714, 721 (D.Cal.1980) *rev'd on other grounds*, 681 F.2d 645 (9th Cir.1982). Negligent selection or supervision is unquestionably an area for the judiciary. The government is liable only where "the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Sami v. United States*, 617 F.2d 755, 766–767 (D.C.Cir.1979). The government is held responsible for "any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of public policy factors." *Id.* at 766. The issue of whether defendant delegated funding authority to persons unreasonably unfit to exercise it is one that must be left for trial.

## III. STATUTE OF LIMITATIONS

 If an action is presented more than two years after the claim accrues it is barred by the statute of limitations applicable to the FTCA. 28 U.S.C. § 2401(b). Courts which have considered the question are unanimous that mental and legal disabilities do not toll the statute of limitations under the FTCA because the statute is jurisdictional. However, in *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C.Cir.1977), the court stated (citation omitted):

Read into every federal statute of limitations ... is the equitable doctrine that in the case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or

by reasonable diligence could have discovered, the basis of the lawsuit.

The diligence-discovery rule applies not only to concealment cases but also "where a plaintiff demonstrates that his injury was inherently unknowable at the time he was injured." *Barrett v. United States*, 689 F.2d 324, 327 (2nd Cir.1982), *cert. denied Cattell v. Barrett*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

■ The focus of the statute of limitations arguments in this case must be discussed with careful consideration of what is being alleged. This is not a medical malpractice case although there are aspects which may implicate treating the case for limitations purposes as negligence in promoting medical malpractice. This case involves the alleged negligence by the CIA in secretly funding a doctor who allegedly carried out experiments on unwitting human subjects. This Court cannot agree with defendant that knowledge of injury by Dr. Cameron constitutes the accrual date of plaintiffs claims. The CIA backing of Dr. Cameron is the focus of this case. Although the case may turn on whether Dr. Cameron's actions, as reflected in his research application were medically unsafe, unethical or purely experimental; plaintiffs do not seek damages from the government on a vicarious liability theory. Instead the gravamen of the claim is that the reason the plaintiffs were injured was because the CIA funded a research experiment on human guinea pigs. The pivotal question is when plaintiffs' claim accrued against the CIA not Dr. Cameron.

There are factual issues in dispute as to the extent of concealment surrounding this case. Concealment can toll the limitations but only as long as the plaintiff could not unearth the critical facts by exercising due diligence. Defendant admits that the MKULTRA programs were covert and that the identity of the CIA as the funding source was to be kept secret. This is not material, however, to the significant difficult question of notice that is raised in this case.

Although the CIA funding was undisclosed for many years, defendant argues that it came to light when a book by John Marks, *The Search for the Manchurian Candidate*, was published in 1979 and various other articles were subsequently published in newspapers and journals. For clarity in analyzing the significance of this in relation to each plaintiff a list of each plaintiff's filing date follows:[6]

| Name | Date of actual notice | Date of filing |
| --- | --- | --- |
| Mr. Page | February 9, 1979 | March 14, 1980 |
| Mr. Logie | February 12, 1979 | March 14, 1980 |
| Mrs. Huard | March, 1980 | Nov. 25, 1980 |
| Mrs. Stadler | March 11, 1980 | Nov. 25, 1980 |
| Mrs. Zimmerman | June 10, 1982 | Feb. 4, 1983 |
| Mrs. Langleben | June 10, 1982 | Feb. 4, 1983 |
| Mr. Weinstein | August, 1980 | Feb. 4, 1983 |
| Dr. Morrow | Summer 1977 | March 25, 1981 |

Although the first six plaintiffs filed suit within two years of their stated "actual notice", defendant contends that the numerous articles and programs detailing the funding "should have" put them on notice.[7]

---

**6.** The claim of Mrs. Orlikow is not be discussed because defendant does not contend that her claim should be dismissed on statute of limitations ground. Motion for Summary Judgment at 35.

**7.** Defendant cites to publication of *The Manchurian Candidate* in 1979, *Canada AM* television program on February, 1979, *Fifth Estate* television program on March 11, 1980, *Quebec Science* article on March ,1980, *Saturday Night* article on June, 1979, *MacLean's Magazine* article on February 12, 1979, *Montreal Star* newspaper article on January 29, 1979, *Montreal Gazette* newspaper article on July 26, 1979, September 11, 1979 and December 12, 1980. Defendant asserts that at least 25 articles were

The critical issues relate to causation and identity. Fraudulent concealment claims play a part insofar as plaintiffs were kept from the CIA's true identity and the extent of the CIA involvement. The doctrine loses its substance, however, as soon as a plaintiff receives actual knowledge of facts sufficient to justify a claim. The problem for the Court is what constitutes "due-diligence." It is a term that is hardly self-explanatory.

In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), a medical malpractice case, the Supreme Court held that the plaintiff's ignorance of his legal rights did not constitute the "blameless ignorance" for which tolling is applied. Neither does ignorance of the law ordinarily toll the statute of limitations. *Richards v. Mileski*, 662 F.2d 65, 71, n. 10 (D.C.Cir.1981). But where the actual fact that he has been injured is unknown or the facts about causation may be in the control of the putative defendant, then the plaintiff is more at the "mercy" of the defendant and tolling is justified. *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359. Where the "what" element and the "who" element is missing from the puzzle, a claim against the government should be tolled if plaintiff has expended due diligence to uncover these facts. *Barrett v. United States*, 689 F.2d at 330 (1982).

It is defendant's burden to show that these plaintiffs could have discovered the CIA involvement if they had exercised due diligence. When analyzing this case, the Court is painfully aware that plaintiffs all suffer from some mental disorder. Whether this was a consequence of Dr. Cameron's actions or the CIA negligence is a matter left for trial. Plaintiffs contend

that they are individuals who innocently sought legitimate help for their varying degrees of mental disorders and were instead used as unwitting human subjects in experiments funded by the CIA. Particularly troublesome is the task of ascertaining when such individuals should or did know of the facts when it is obvious these plaintiffs were diagnosed as suffering from various types of mental dysfunctions even before their "treatment" and allegedly were in varying degrees of mental impairment thereafter. Curiously, often a classic manifestation of people who are afflicted with certain psychotic disorders is the irrational fear that the CIA and FBI is conspiring to harm them. In this case, the CIA involvement is real and the covert nature of the involvement is not contested. Only causation is disputed. Where the alleged negligence caused the mental harm which affects a plaintiff's ability to function normally in life, in fairness to that plaintiff, the question of due diligence or when the claim accrues differs from the case where the injury was not related to the plaintiff's cognitive functioning. *Zeidler v. United States*, 601 F.2d 527, 530–531 (10th Cir. 1979).[8] The Court is mindful that generally the principles of equity cannot be invoked to toll the FTCA statute of limitations. The limitations governing claims against the United States should be strictly construed. Although insanity does not toll the running of the statute of limitations in FTCA cases the conditions of the plaintiffs in this case can be considered when evaluating whether they exercised due diligence once the degree of concealment is resolved.

After careful consideration of defendant's assertion that the publications

---

written about Dr. Cameron and his funding by the CIA prior to January 1, 1981. Defendant's Motion Exhibit 30.

8. This is not to say that the traditional tolling doctrines apply to the FTCA statute of limitations. "It is clearly the law that disabilities due to insanity or mental incompetency will not toll the running of the two year statute of limitations of § 2401(b)." *Zeidler*, 601 F.2d at 529. In one case, where the government had negligently caused plaintiff's coma and thereby, through this negligence prevented plaintiff from

knowing that he had been injured, the Court held that the statute of limitations was tolled. *Washington v. United States*, 769 F.2d 1436, 1438 (9th Cir.1985). There was no claim for actual fraudulent concealment in this case. It is likely, therefore, that when there are issues of fact on the government's concealment and there are allegations that the actions interfered with the plaintiff's mental capacity to be aware there should be special considerations of the plaintiff's condition.

triggered the statute of limitations, the Court cannot hold as a matter of law that there was notice. *See Hobson v. Wilson,* 737 F.2d 1, 38–39 (D.C.Cir.1984), *cert. denied Brennan v. Hobson,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Newspaper articles containing allegations do not necessarily place citizens on notice when there is no evidence that these articles were read. When six of the plaintiffs heard or read of the CIA funding they initiated suit within the requisite time period. The extent of the articles' reach, the popularity of the paper, the ability of the plaintiffs to follow daily public events, especially under the circumstances of this case, are all issues difficult to discern at this posture. This Court declines to hold that the facts submitted somehow place a duty on these plaintiffs to have read the applicable articles. Without actual notice or without having read the articles it would go too far to state that the statute of limitations began to run when the articles were published.[9] The trier of fact must resolve the issue of diligence and notice. *Hobson v. Wilson,* 737 F.2d at 38–39, n. 116, n. 118. This conclusion specifically involves the arguments against plaintiffs, Mrs. Stadler, Mrs. Huard, Mr. Logie and Mr. Page, Mrs. Zimmerman and Mrs. Langleben. There is no evidence suggesting that these plaintiffs had notice prior to the dates they have submitted. Plaintiffs Dr. Morrow and Mr. Weinstein must be considered separately because they filed claims more than two years from the dates they claimed to have had *actual* notice.

 Plaintiff Weinstein filed his FTCA claim on February 4, 1983. When he entered Dr. Cameron's care he was suffering from anxiety manifested by certain physical ailments. He was left physically and mentally impaired after "treatment". An affidavit executed by Dr. Harvey Weinstein, plaintiff's son who is a psychiatrist, states that his father received LSD, various unmarketed experimental drugs, 65 electro-

convulsive shocks, drug induced sleep for 54 days and sensory deprivation along with psychic driving. In his medical opinion his father suffers from chronic organic brain syndrome as a direct consequence of Cameron's treatment. This problem has left plaintiff with a deficit in information processing that inhibits his ability to understand facts and make decisions. Furthermore, Dr. Weinstein claims that he read about the CIA funding in an article about John Mark's book and feared that his father's condition was too fragile to broach the subject. After informing his mother, the information was conveyed to Mr. Weinstein who became very upset and was *unable* to discuss it. Not until some time later did Dr. Weinstein begin to broach the subject again gently and ultimately supported Mr. Weinstein in joining the ongoing lawsuit. Plaintiff's Opposition Exhibit 16.

Defendant contends that plaintiff Weinstein admitted in deposition that he learned of the CIA involvement from the Marks book and after reading a newspaper article.

Q. Okay. Your Interrogatory answers state that you learned in the 1980 about the Marks book. Does that sound right to you, timewise.

A. Well I couldn't tell you exactly. I wouldn't know just when it was. That's impossible for me to know. I don't know.

Q. How did you learn about Mrs. Orlikow's lawsuit, the one that you are currently a member of?

A. It was in the paper, the newspaper.

Q. Do you recall what was said in the newspaper?

A. No I don't know what was said. I read it at the time, but I don't know. I don't recall what was said.

Q. ... What I'm trying to figure out is how—you had your own lawsuit against the—

---

**9.** It would be a difficult task indeed to determine how many articles and from what source would accurately reflect whether a story was "public knowledge". With the room for error in journalism or the possibility that an article may not reflect a complete story, it is fruitless to say in hindsight that a newsworthy article should have been read or only a citizen who combs the newspapers for public stories can constitute a diligent plaintiff.

A. I don't remember how that came about at all, I can't recall how it came about.

Q. When you first learned about the Marks book, what was you reaction?

A. Well, I read it. I was, what you say stupefied, unbelievable, couldn't believe a thing like that happened.

That they allowed a thing like that to happen ...

Q. ... I asked you why you were unable to act on that knowledge until late 1982. I asked why you were unable to act as you said ...

A. Because I couldn't make up my mind. I couldn't believe what I had read. I couldn't believe it's possible.

Weinstein Deposition at 80.

Mr. Weinstein filed his claim 2 years and 6 months after the date he claims to have knowledge of the CIA involvement. At first glance it appears that Mr. Weinstein had knowledge of the CIA involvement and waited over two years to file his claim. This case cannot be evaluated, however, without a long hard look. There is evidence which suggests that Mr. Weinstein suffers a psychological impairment which significantly interferes with his ability to comprehend and process in a manner of a normal functioning individual. Although insanity cannot toll the statute of limitation, the question is did Mr. Weinstein actually "know" in the true sense of the word. There is a question of fact how significantly the disorder which allegedly was caused by Dr. Cameron's "experiment" interfered with Mr. Weinstein's ability to be fully aware of the facts. The question of whether Mr. Weinstein had knowledge sufficient to trigger the statute of limitations prior to February 1981 is a factual issue and it must be resolved at trial.

■ Dr. Morrow's knowledge is less questionable than Mr. Weinstein. She states in her deposition that she learned of the CIA funding in the summer of 1977. Morrow Dep. at 182. The Canadian attorney who represented Dr. Morrow in her

suit against Dr. Cameron, sought information from the CIA in 1977 through 1979.[10] The Court notes that the attorney was apparently unsuccessful in his attempts to receive information from the CIA confirming any form of reference about her and the experimental depatterning treatment given her or if she was one of the experimental subjects. Defendant's Motion Exhibit 24. Although this may constitute concealment, as plaintiffs contend, it is beyond doubt that the attorney repeatedly refers to Dr. Morrow as an unwitting subject of experimentation by CIA funding. Dr. Morrow thereby had knowledge of the "who" and "what" of her cause of action. It cannot be alleged that there is concealment if the crucial elements of a claim are no longer unknown. Certainly, soliciting information constituting a confession that the CIA experimented on Dr. Morrow is making proper inquiries but the issue is when a claim accrues not whether a plaintiff possesses a uncontroverted cause of action. Dr. Morrow's claim must therefore be dismissed.

## IV. SUMMARY JUDGMENT, FOREIGN EXCEPTION, INDEPENDENT CONTRACTOR

The remaining arguments of defendant are handled in this single section because they do not involve a complex analysis.

■ This case clearly has material issues of fact in dispute which must be resolved at trial. The question of whether the CIA should have known that Dr. Cameron's research was clearly beyond the medical standard of care can only be answered once the disputed facts are resolved. Although, all of the plaintiffs did not experience the technique labelled "psychic driving" the Court cannot conclude that the CIA involvement is thereby precluded. The research application obviously requests funds to experiment with various techniques to assist in "more effective" depatterning. Depatterning is an integral

10. Dr. Morrow filed a lawsuit against Dr. Cameron's estate in Canada. The Court did not find that Dr. Cameron was negligent and Dr. Morrow did not receive a judgment. Defendant's Exhibit 5 attached to Defendant's Statement.

component of psychic driving and cannot be severed from the CIA funded research which occurred. Therefore, because each plaintiff was administered at least one form of Dr. Cameron's depatterning technique, there will be no dismissal simply because psychic driving may not have been administered.[11]

■ Defendant also argues for dismissal under the Foreign Country Exception, 28 U.S.C. § 2680(k). The injuries undeniably occurred in Canada. The FTCA, for purposes of imposing liability, however, focuses on the place of the government employee's act or omission. *Sami v. United States*, 617 F.2d at 761–762 This Circuit has stated that: "No case to our knowledge has held the United States exempt from liability for acts or omissions occurring here which have their operative effect in another country." *Id.* at 762. Plaintiffs allege negligence by the CIA in supervising employees and funding Dr. Cameron. The Court concludes, at least based on the present record, that the claim does not "arise in a foreign country" and thereby does not fall within the ambit of section 2680(k).

■ It must be noted that plaintiffs do not raise any claim based on vicarious liability. *See* Plaintiffs' Opposition at 51. Defendant's arguments on this point are misdirected. The issue raised concerning the government's liability for acts of an independent contractor are likewise extraneous. Where the government negligently selects a third party to carry out its policy there is a duty to do so reasonably. *Melton v. United States, supra.* The plaintiffs allege negligent funding of an extra hazardous activity and negligent funding of malpractice. Although the Court believes that these two counts contain essentially the same theme,[12] they are certainly valid claims of negligence.

## V. CONCLUSION

The extensive briefs and discovery submitted reflect the complex nature of this case, both legally and factually. After carefully considering the papers, the Court concludes that there are geniune issues of material fact in dispute which preclude a decision on many of the legal arguments presented. Only the issue involving Dr. Morrow's claim, where the statute of limitations bars her suit, can be resolved at this time. Therefore, defendant's motion for summary judgment must be denied in part, and granted in part. Resolution of certain legal arguments must await plaintiffs' opportunity to have their day in court.

An appropriate order has issued granting the motion in part, as it realtes to Dr. Morrow, and denying the motion in part, as it relates to the remaining plaintiffs. The case is set for a status call, at which time the parties shall be prepared to schedule pretrial and trial dates.

---

11. Defendant also stresses that certain plaintiffs did not receive LSD or psychic driving during the research funding. Defendant's Statement pars. 119 and 120. Although this is significant insofar as each plaintiff received some form of alleged experimental technique during the CIA involvement, the issue of causation must still be left for resolution at the trial.

12. There is no direct evidence that the CIA intentionally set the parameters of Dr. Cameron's alleged brainwashing experimentation. Therefore, whether his practices were below the standard of care and thereby negligent strongly reflects on whether the actions were known experimentation procedures and potentially hazardous.